**UNITED STATES of America**

v.

**William Edward ZEILER, Appellant.**

**UNITED STATES of America**

v.

**William Edward ZEILER, Richard Peter Chiocca, William Edward Zeiler, Appellant.**

**Nos. 17817, 17818.**

United States Court of Appeals, Third Circuit.

Argued Nov. 20, 1970.

Decided June 5, 1970.

# 1306

James P. McKenna, Jr., Dickie, Mc-Camey & Chilcote, Pittsburgh, Pa., for appellant.

Stanley W. Greenfield, Asst. U. S. Atty., Pittsburgh, Pa. (Richard L. Thornburgh, U. S. Atty., Pittsburgh, Pa., on the brief) for appellee.

Before HASTIE, Chief Judge, and VAN DUSEN and ADAMS, Circuit Judges.

## OPINION OF THE COURT

HASTIE, Chief Judge.

During a period spanning more than five years the Pittsburgh area was plagued by a series of bank robberies all thought to have been committed by the same "Commuter Bandit." The exploits of this unknown robber and his ability to avoid detection aroused considerable public attention. The arrest of a suspect, William Zeiler, on June 23, 1967 was attended by massive publicity. For several days newspapers and television stations prominently displayed pictures of the arrest, comments by the chief FBI agent in Pittsburgh, and photographs of Zeiler in comparison with earlier composite sketches of the "Commuter Bandit." *See* United States v. Zeiler, W.D.Pa.1968, 278 F.Supp. 112.

Three days after Zeiler's arrest counsel was appointed to defend him. On July 6, 1967 a lineup was held attended by the accused's counsel and some fifty persons who had witnessed the various robberies thought to have been committed by the "Commuter Bandit." On August 1, 1967 Zeiler was indicted by a federal grand jury and charged with the perpetration of some eleven bank robberies. Trial for ten of these robberies commenced January 9, 1968 and concluded January 23, 1968 with convictions for two of the robberies. In a second trial concluding June 7, 1968 Zeiler and a co-defendant were convicted of a single bank robbery.[1] Before us are appeals from both convictions.

During the course of the trials it became apparent for the first time that after Zeiler had been taken into custody and after counsel had been appointed to defend him, but before the already scheduled lineup was held, the FBI had privately confronted each eyewitness with a series of photographs for identification. Relying on United State v. Wade, 1967, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149, the defendant contends that these pretrial photographic identifications held in the absence of his appointed counsel violated his Sixth Amendment rights or, in any event, made the witnesses in question incompetent for subsequent in-court identifications.[2]

In *Wade* the Supreme Court was concerned with the inherent danger of mistake in eyewitness identifications. It recognized suggestive pretrial confrontations conducted by the police to elicit identification evidence as a major cause of mistaken identifications. A witness once induced by such a suggestive confrontation into making a mistaken identification is extremely unlikely later to

---

1. Following the guilty verdict in the first trial, the defendant's oral motion for judgment of acquittal or for a new trial was denied. Following the second trial the defendant filed a motion for judgment of acquittal or for a new trial. This motion was denied in an opinion. United States v. Zeiler, W.D.Pa.1969, 296 F.Supp. 224.

2. United States v. Wade, *supra*, applies to all cases arising after June 12, 1967, the date of that decision and the companion decision in Stovall v. Denno, 1967, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199, which denied retrospective effect to *Wade*. In the present case all the relevant events, including Zeiler's arrest, transpired after that date.

change his mind. The defendant, unrepresented at this critical pretrial identification proceeding, is severely hampered thereafter in ferreting out the elements of prejudice and reconstructing at trial what actually took place. In order to avert the chance of prejudice and to preserve the defendant's ability effectively to question the reliability of the identification, the court determined that at least at post-indictment lineups the defendant is entitled to the presence of counsel.

■ The considerations that led the court in *Wade* to guarantee the right of counsel at lineups apply equally to photographic identifications conducted after the defendant is in custody.[3] The dangers of suggestion inherent in a corporeal lineup identification are certainly as prevalent in a photographic identification. P. M. Wall, Eye-Witness Identification in Criminal Cases 66–89 (1965). Also the defendant, himself not being present at such a photographic identification, is even less able to reconstruct at trial what took place unless counsel was present. Comment, Criminal Procedure —Photo Identifications, 43 N.Y.U.L.Rev. 1019 (1968). In addition, the constitutional safeguards that *Wade* guaranteed for lineups may be completely nullified if the police are able privately to confront witnesses prior to the lineup with suggestive photographs. Indeed, the present case lends support to the fear expressed by a discerning judge that the absence of a requirement of counsel at photographic confrontations will actually encourage the police to abuse the identification process. United States v. Marson, 4th Cir. 1968, 408 F.2d 644, 651 (Winter, J., concurring and dissenting),

cert. denied, 393 U.S. 1056, 89 S.Ct. 695, 21 L.Ed.2d 698. We hold that the rule of the *Wade* case applies to pretrial photographic identifications of an accused who is in custody.

■ We come now to the issue whether Zeiler's motions for new trials, on the ground that identification testimony was wrongfully admitted, were properly denied. Zeiler first contends that testimony that the witnesses had made pretrial photographic identifications of the accused was erroneously placed before the jury as part of the prosecution's case. The record shows that, with one exception, each eyewitness at both trials did testify on direct examination to having previously identified Zeiler during the pretrial exhibition of photographs. This evidentiary use of the improper photographic identification obtained after the arrest of the accused and in the absence of his counsel was constitutional error. Gilbert v. California, 1967, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178. "Only a *per se* exclusionary rule as to such testimony can be an effective sanction to assure that law enforcement authorities will respect the accused's constitutional right to the presence of his counsel at the critical lineup." *Id.* at 273, 87 S.Ct. at 1957. We already have pointed out that the need and reason for counsel at a photographic identification after arrest is even greater than in the case of a lineup.

■ This error in itself requires reversal of both convictions. However, the question remains whether in-court identifications of Zeiler by the questioned witnesses may be admitted into evidence

3. Simmons v. United States, 1968, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247, upon which the government relies, did not deal with the issue of right to counsel at photographic identifications. The photographic identification in that case occurred prior to arrest and was part of the investigation process. However, when as in the present case, the investigation has resulted in the arrest of an accused, the right to counsel attaches. Moreover, while photographs are an important tool

in investigating unsolved crimes and apprehending suspects, Simmons v. United States, *supra*, their use after the accused has been taken into custody is in most cases unnecessary. The requirement of counsel at photographic identifications conducted after the accused is in custody and available for a more reliable corporeal identification will not hinder the police in the legitimate enforcement of the law.

on remand. In order for such in-court identifications to be admissible the government must "establish by clear and convincing evidence" that the witnesses were not influenced by the prior improper photographic confrontations. United States v. Wade, *supra* at 240, 87 S.Ct. at 1939.

From the information the defendant was able to adduce during cross examination it is evident that the photographs shown to the witnesses who identified Zeiler at his second trial were very suggestive. Each of these witnesses was confronted with eight photographs, five of various different individuals and three of Zeiler. We have examined these photographs. Those of the other men were police "mug shots"; dual pictures showing full face and profile and bearing police markings. In contrast, the three pictures of Zeiler were ordinary snapshots; a difference which could easily have impressed the viewers who were all aware that a person thought to be the "Commuter Bandit" had only recently been apprehended. Even more suggestive was the fact that only Zeiler was pictured wearing eyeglasses, as the actual perpetrator of the robbery had done. Thus, the attention of each witness who focused on Zeiler's picture as identifying the suspect with whom the investigators were concerned. Moreover, this entire procedure was absolutely unnecessary with the witnesses all available for the forthcoming lineup. Even absent the issue of the right to counsel at this critical showing of Zeiler's picture to the witnesses, such photographic identification might well be deemed "so unnecessarily suggestive and conducive to irreparable

mistaken identification," and so pointless for any purpose other than suggestion, as to violate due process. Stovall v. Denno, 1967, 388 U.S. 293, 302, 87 S.Ct. 1967. Certainly it was grossly improper.[4]

Recognizing the highly suggestive character of this pretrial identification procedure, the district court was persuaded that the subsequent in-court identifications by these improperly prepared witnesses were admissible on the ground that the prosecution had "establish[ed] by clear and convincing evidence" that the witnesses had not been influenced by the prior improper photographic confrontation. *See* United States v. Wade, *supra* at 240, 87 S.Ct. 1926. But on the present facts we think that was not a permissible conclusion. The robbery for which Zeiler was convicted at his second trial occurred some three and a half years before the suggestive confrontations. In addition, none of the witnesses was able to view the robber for more than a few minutes. None of them knew Zeiler. The court found nothing unusual in his appearance. In such circumstances susceptibility to suggestion and the danger of misidentification are particularly grave. The district court seems to have given decisive weight to the unequivocal way in which the witnesses identified Zeiler in the courtroom. However, their positiveness is irrelevant to the issue whether, consciously or subconsciously, that very in-court confidence in identification had been built up by the prior suggestive confrontation.[5]

■ Thus, with reference to the second trial at least, the impropriety and great suggestiveness of the conduct of

---

4. The defendant contends that the intensive newspaper and television coverage surrounding his arrest, which was gathered in large part within the confines of the Federal Building, rendered incompetent the identification testimony. We find it unnecessary to determine whether publicity alone would require reversal. However, we do observe that in an atmosphere already so rife with the risk of suggestion, the conduct of the FBI in privately confronting the witnesss with

suggestive photographs was particularly irresponsible and could only increase the risk of misidentification.

5. The district court also relied on the fact that after the robbery and before Zeiler was arrested the witnesses had been shown many photographs without identifying the robber. This fact indicates no more to us than that the witnesses were unable to make an identification until shown highly suggestive photographs.

the FBI in obtaining the photographic identifications, the absence of counsel on those occasions and the resultant untrustworthiness of subsequent trial identifications by the tainted witnesses combined to make these witnesses legally incompetent for in-court identification. The conviction appealed at No. 17818 must, therefore, be reversed and the cause remanded for a new trial at which the witnesses in question shall not be permitted to identify the accused.

■ In contrast to the second trial, the record of the first trial does not even indicate what photographs were shown to the identifying witnesses in the absence of counsel. We already have pointed out that the burden is on the prosecution "to establish by clear and convincing evidence" that the in-court identifications were not influenced by the photographic identifications improperly conducted in the absence of counsel. United State v. Wade, *supra* at 240, 87 S.Ct. 1926. Rather than hold at this stage that the prosecution , has not sustained its burden, we are constrained by the decision in *Wade* to grant the prosecution a further opportunity in a hearing before the district court. Thus, if on remand the conduct of the photographic identifications is found to have been significantly less suggestive in this case than the other, that fact, together with all other circumstances that support or militate against the claim of each witness that his in-court identification has not been influenced by the photographic identification, must be considered by the trial judge in deciding whether the prosecution had carried its heavy burden of proving that the witness was not influenced and thus made incompetent for subsequent in-court identification. See United States v. Wade, *supra* at 241, 87 S.Ct. 1926.

For these reasons the convictions will be reversed on both appeals and the cases will be remanded for new trials consistent with this opinion.