**UNITED STATES ex rel. Cleveland REED, Petitioner,**

v.

**Raymond W. ANDERSON, Warden, Delaware Correctional Center, Respondent.**

**No. 140.**

United States District Court,
D. Delaware.

May 24, 1972.

Stanley C. Lowicki, of O'Donnell, Hughes & Lowicki, Wilmington, Del., for petitioner.

## MEMORANDUM OPINION AND JUDGMENT

LATCHUM, District Judge.

The Court on July 9, 1970 granted a conditional writ of habeas corpus in this case for the reasons set forth in its opinion found in 329 F.Supp. 15 (D.Del. 1971). The writ issued based upon the holding in United States v. Zeiler, 427 F.2d 1305 (C.A. 3, 1970) which this Court was duty bound to follow. Upon appeal of this case, the United States Court of Appeals for the Third Circuit, sitting *en banc,* reversed *Zeiler,* vacated

the writ of habeas corpus entered herein, and remanded the proceedings to this Court for a determination whether from the totality of circumstances it appeared that the photographic identification procedure was so impermissibly suggestive as to give rise to a substantial likelihood of irreparable misidentification. United States of America ex rel. Reed v. Anderson, 461 F.2d 739 (C. A. 3, 1972) (April 11, 1972).

From the State Court trial transcript it appears that the robbery victim, Max Feldman ("Feldman"), identified Reed as one of his robbers and assailants from a batch of ten "mug shots" shown to him by the police. Petitioner's attorney examined the ten photographs at trial and the victim was extensively questioned and cross examined on voir dire regarding his identification of Reed. His attorney raised no question regarding any impermissible suggestiveness of the photographs other than one concerning the alleged impropriety of showing the victim a photograph of Reed and one of Anthony Hawkins, his co-defendant, which carried the date 8/10/68 (the day following the robbery) while the other eight "mug shots" shown to the victim bore considerably earlier dates.[1]

Considering this contention, the Delaware Supreme Court found:

"Ten photographs were shown to the victim, eight being photographs of others and two being photographs of the defendants. The evidence shows that, without aid or hesitation, the victim quickly identified the defendant's photographs as those of his assailants. The defendant contends that impermissible suggestion arose from the fact that his photograph and that of Hawkins bore the dates they were taken on the day after the offense, whereas the other photographs bore dates of earlier years. When queried on voir dire about the dates on the photographs, the victim testified: 'I never gave it a thought, never bothered to look at that.' He further testified: 'As long as I am standing here and sworn on that Bible, I didn't see that. I didn't pay no attention to that.' And to the statement 'Of the batch given you, only two of them had a recent date on them', the victim testified: 'I didn't know that at the time. I just found that out. This is the first time I am hearing or realizing it is put on that way. I didn't know that at the time. I didn't know until you pointed it out now.'

Considering the totality of the circumstances of the photographic identification in the instant case, we are satisfied that the proceeding was not so impermissibly suggestive as to violate due process under the rule of the Simmons case (Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247)" (Reed v. State, 281 A. 2d 142, at 147).

An independent examination of the State Court trial transcript convinces this Court that the Delaware Supreme Court correctly determined that the appearance of dates on the mug shots used for the identification of Reed was not so impermissibly suggestive as to violate due process under the rule laid down in Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

In addition to the Delaware Supreme Court's reference to the trial record supporting its determination, the trial record contains other testimony of the victim which clearly demonstrates that his identification of Reed was not impermissibly influenced by the photographic display.

---

1. The dates appearing on the other eight "mug shots" shown to the victim were 6/29/57, 12/21/62, 12/21/62, 10/3/63, 5/20/64, 7/1/64, 9/29/64 and 12/30/66. (Trial Transcript "Tr." p. 24). In this proceeding the Attorney General, after an extensive search, has been unable to produce the ten photographs exhibited to the victim because these trial exhibits were withdrawn from the State Court records following the appeal to the Delaware Supreme Court and cannot now be found.

When Feldman was queried on voir dire by counsel for the State and the defendants, he testified as follows:

\* \* \* \* \* \*

Q. "Were all of these pictures that you identified all of men that were shown as Negroes?

A. "Yes.

Q. "Were they all relatively the same age?

A. "No, I don't think so.

Q. "They were not, they were different ages?

A. "I guess they were, I wouldn't know. I was just looking for somebody that I could recognize. I didn't have any trouble with Hawkins [2] and Reed. I came up with Reed, too, because I sort of recognized his side face. When he bent down over and was going through my pockets, his face was right in me.

Q. "So you are saying you recognized Reed from the side view?

A. "Yes.[3]

\* \* \* \* \* \*

Q. "Was there some doubt in your mind as to whether or not this was the man?

A. "At that time out of all the pictures I went into, no doubt in my mind of the pictures that I seen there. I would have chosen that one. There was no doubt amongst the others that I had seen.[4]

\* \* \* \* \* \*

Q. "Can you tell me again what the characteristics were of Reed that struck you?

A. "His face, the rough nose on his face and profile on the side.

Q. "Is there any identifying marks or anything?

A. "Well, his face had a roughness to it and I'd say—

Q. "What do you mean by roughness, 'pock marks?

A. "Yes, I guess you would call it that and plus the fact that he had a little mustache when he came in. Both of them did.

Q. "There was a mustache on the picture?

A. "Yes. . . .[5]

\* \* \* \* \* \*

Q. "Today seeing these two men, can you tell us whether they were the ones in your store?

A. "I would say both of them were.

Q. "Can you say that without having the benefit of looking at these pictures?

A. "I think I could.

Q. "Can you tell me why you could do that or cannot do that?

A. "Well, there is a photographic picture of both of them in my mind since this happened. . . I can picture him [Reed]. If I could draw, I could draw picture of him when he came in there with his overcoat and he slouched over on the counter there and in the back room he leaned towards me and had the shotgun on me and he was standing over me with the shotgun and standing there and going through my pockets. . . .[6]

\* \* \* \* \* \*

Q. "We are just dealing with the identification. I want to get this again. So with the time of seeing Reed come into the store twice and Mr. Hawkins coming in, can you say if you had not seen those pictures you could identify them?

A. "At that time I sure could.

Q. "And today?

A. "Yes.

Q. "Do you have any question in your mind about that?

---

2. Hawkins was a co-defendant tried at the same time as Reed.

3. Tr. 13.

4. Tr. 14.

5. Tr. 15–16, see also 136–137.

6. Tr. 20.

A. "Right now I don't. I don't have no question because right after that when they showed me these pictures and I picked it out—it is photographed up here. I got a picture up here and I can pick them out." [7]

 When this Court conditionally granted the writ of habeas corpus on July 9, 1970, it did not pass on the petitioner's contention that his constitutional right to confront a witness had been violated. The Court now rules on that contention. Reed contends that the state trial court admitted into evidence a confession of Reed's co-defendant, Hawkins, which implicated Reed and that while Hawkins took the stand, it was for a very limited purpose unrelated to the confession. He argues that, since he had no opportunity to cross examine Hawkins about his confession, this violated the rule announced in Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

This contention is wholly without merit. After thoroughly searching the record, the Court finds that no confession of the co-defendant Hawkins implicating Reed was ever introduced into evidence. While certain physical evidence, found as a result of Hawkins' confession made to the police, was admitted against Hawkins, it did not implicate Reed. The trial judge, recognizing this fact, gave the following instruction at Reed's request:

"There has been and there was evidence received in this trial of a statement or statements made by the defendant Hawkins, made after his arrest and outside of the hearing and the presence of the codefendant Reed. These statements, which included a reference made to the route of exit [Hawkins took] from the scene of the crime and the clothing worn by the defendant Hawkins, where it was left by him, the identification of the hammer, can be considered, if it is to be considered at all, only as evidence against the defendant Hawkins who was alleged to have made such statements. You may not consider them against the codefendant Cleveland Reed." (Tr. 242).

There was no violation of the *Bruton* rule.

No probable cause exists for an appeal. Fitzsimmons v. Yeager, 391 F.2d 849, 854 (C.A. 3, 1969).